# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-1508

COLTON JOHN HARRIS,

  Plaintiff,

v.

TAKE-TWO INTERACTIVE SOFTWARE, INC.,

a Delaware corporation,

  Defendant.

---

## AMENDED COMPLAINT

---

Plaintiff, Colton John Harris ("Plaintiff"), brings this action against

Defendant, Take-Two Interactive Software, Inc. ("Take-Two Interactive"), and alleges as follows:

I. PARTIES

1. Plaintiff, Colton John Harris, resides in Colorado Springs, CO.

2. Defendant, Take-Two Interactive Software, Inc., is a Delaware corporation with its

   principal place of business at 110 West 44th Street, New York, NY 10036, USA.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction under 28 U.S.C. § 1331 because the action involves claims arising under federal laws, including the Sherman Act (15 U.S.C. §§ 1-7), the Clayton Act (15 U.S.C. §§ 12-27), and the Computer Fraud and Abuse Act (18 U.S.C. § 1030). The Court also has supplemental jurisdiction over state law claims, such as unjust enrichment, under 28 U.S.C. § 1367.

4. Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(2) as the events leading to the claims took place in El Paso County, Colorado

## III. FACTUAL ALLEGATIONS

5.    Plaintiff develops scripts and 3D models using Blender and scripts VSCode on his personal computer and server. Plaintiff does not sell assets on Take-Two Interactive's services like GTA5 Online, nor does he use Take-Two's platform for content creation. All content is independently created using Blender and VSCode.

6.    On April 17, 2019, Plaintiff created an account on CFX.re, prior to Take-Two Interactive's acquisition. Plaintiff's use of CFX.re was independent of any affiliation with Take-Two Interactive. See. Exhibit A

7.    Plaintiff operates "LaryGaryMods," creating Blender models and scripts as add-ons for various games. Some of these assets are sold on the Tebex platform.   These assets are also occasionally promoted on CFX.re forums.

8.    On March 5, 2024, an employee of Take-Two Interactive, "Titanium," accessed Plaintiff's account and data on the Cfx.re platform without Plaintiff's legal consent.

9.    "Titanium" with the IP address registered to Take-Two Interactive to conduct this unauthorized access, and communicated through a third-party application named "Discord."

10.    "Titanium" further substantiated this unauthorized access by sending Plaintiff a screenshot as evidence of being inside Plaintiff's keymaster connected to a protected computer and system. See. Exhibit F  Keymaster was designed to protect assets from being leaked or resold. See. Exhibit C

11.    "Titanium" stated they were "trying to check" Plaintiff's source code and not just Plaintiff's but looking through everyone's asset IDs to find Plaintiff's asset source code and wanted the asset ID. "I have over two million assets to search through, a script name will lead to a lot of results. Please, I need your cooperation here." See. Exhibit E. Plaintiff did not feel comfortable providing any source code or assets, as "Titanium" was an account used for a data breach in the past, and Titanium's permissions had already been revoked. Here is a quote from the Incident report on Cfx.re:

"They did this by brute-forcing passwords" See. Exhibit D "using a large amount of IP addresses to mask their attempts.Starting October 17th up until November 3rd, the attacker was able to scrape account data off our forums. This happened at a rate that was unnoticeable by our metrics. Once we discovered the post created by the attacker, we disabled all element accounts to prevent further use. We've identified the entry point and the full scope of the data breach;

- We've disabled all of the afore-mentioned element accounts and removed their permissions;

- We've audited our logs to confirm nothing else has been compromised;

- We've released an initial change to Keymaster to prepare for the upcoming license key regeneration.

- We are in the process of notifying all relevant Data Protection Authorities (DPAs) of the breach.

- Server license keys will be regenerated by November 14th. A notification will be sent out to all relevant server owners.

- Keymaster will encode license keys in our database to prevent them from being read by anyone but the server owner.

- We're changing internal security & audit policies to prevent breaches like these from happening again.."

  See. Exhibit F.

Defendant had no authorization to review any assets, yet the examination of additional assets owned by other individuals indicates a broader, unauthorized scope of investigation.

12.     On March 5, 2024, Defendant's employee accessed Plaintiff's account without permission, as evidenced by the IP log from Plaintiff's Google account "Hello, We noticed a login from a device or location you don't usually use. Was this you?" See. Exhibit D, which shows an unauthorized login attempt from an IP address traced to Take-Two Interactive. This access occurred without Plaintiff's consent and led to the unauthorized viewing and misuse of Plaintiff's protected assets, as shown by the screenshot provided by the Defendant's employee See. Exhibit F.

13.     Plaintiff has identified specific instances where Defendant's DLC content mirrors the design and functionality of Plaintiff's assets, such as the 'Candy Cane Weapon' and 'Snowball Launcher,' which were first released on Plaintiff's Tebex store on December 12, 2022, and November 19, 2023. These designs are identical in both appearance and functionality to the weapons featured in Defendant's Christmas DLCs released on December 21, 2022, and December 21, 2023 (see Exhibit I for side-by-side comparisons).

14.    Titanium insisted on accessing more assets than the ones in question, leading to a

violation of privacy and trust.  Zee, banned Plaintiff, after  knowledge of the lawsuit.  Zee, also

known as Zeemah, is another community moderator.  After the talk with Titanium, Zee stated,

"Don't come at me with baseless legal threats and expect to walk away from it," as shown in

Exhibit K. This occurred in a 45,000-member Discord server where Plaintiff was tossed around

from Zee to Titanium to Theandra, even though the issue had been resolved with Titanium, who

confirmed, "So I was able to confirm there was no reason for you not to be able to edit your

forum post in case something broke on our end." See. Exhibit E  To further confirm Zee's

involvement, Titanium also stated, "I can see the flagged issue from Zee." See. Exhibit L

Plaintiff was locked out of his Keymaster account on March 8, 2024 by Zee in retaliation to the

lawsuit, not because of copyright infringement, preventing Plaintiff from accessing over 200

assets, including MLOs, scripts, and clothing items that he had developed and sold through his

Tebex store. Tebex was not just a payment processor. Tebex is the official location of the

"Larygarymods" store not cfx.re which was also known and referenced by Titanium as stated

"I'm asking your for your asset id for the resource you sell on Tebex." See. Exhibit E   This

lockout to keymaster data has resulted in lost revenue, as Plaintiff can no longer sell or update

these assets, leading to customer complaints and damage to Plaintiff's reputation in the digital

asset community. These actions are a breach of privacy under Colorado common law due to

unauthorized access and control over Plaintiff's data.

15.    Following the unauthorized access to Plaintiff's data and the subsequent lockout

of his assets, Plaintiff began experiencing severe anxiety, loss of sleep, and stress-induced

physical symptoms such as jaw pain and night terrors. Plaintiff has documented these symptoms

in a pain journal, which records the deterioration of his mental and physical health following the Defendant's actions.

16.     Defendant's employee 'Titanium", contacted Plaintiff via Discord instead of through the official CFX.re forums, which deviates from the standard data protection protocols stated by CFX.re. The use of Discord, along with previously linked to a data breach, raises concerns about the security and legitimacy of Defendant's access to Plaintiff's account. See. Exhibit J

17.     The Defendant has provided a copy of an agreement dated September 12, 2023, which appears to be a general document. However, this document does not include the specific terms or the license that Plaintiff purportedly agreed to at the time of account creation on CFX.re which at the time was not affiliated with Take Two.

## IV. TIMELINE OF EVENTS

18.     Account Creation on CFX.re: Plaintiff created an account on CFX.re on April 17, 2019. This predates Take-Two Interactive's acquisition.

- Attached as Exhibit A is a screenshot showing the account creation date on CFX.re

19.     Agreement with Tebex: Plaintiff entered into an agreement with Tebex around the same time the CFX.re account was created, with the first sale of assets being on June 29, 2021, solidifying the agreement with Tebex, which predates Take-Two Interactive's acquisition of CFX.re.

- Attached as Exhibit B is a screenshot of the Tebex user agreement.

20.     Partnership Agreement: On November 9, 2021, CFX.re entered into a partnership agreement with Tebex to offer Keymaster, a tool designed to protect user assets by encrypting them. This agreement assured CFX.re/Tebex users that their assets would be securely protected from being sold to a third party, from unauthorized access, and was protected by Tebex moderation.

    - Attached as Exhibit C is a screenshot of the announcement on CFX.re of the partnership with Tebex

21.     Take-Two Interactive acquired CFX.re after account creation including control over Keymaster and access to all assets on the platform  as a result of this acquisition, Take-Two Interactive now has indirect access to assets protected by Keymaster.

22.     Unauthorized Access: On March 5, 2024, at 2:22 PM, Plaintiff was contacted by a Take-Two Interactive employee "Titanium" via Discord asking for access to source code and assets sold in his personal Tebex store.

At 3:07 PM, Plaintiff received an email from Google about an unauthorized login attempt  from an IP address traced to Take-Two.

Attached as Exhibit D is the IP log and Google alert indicating unauthorized access.

At 3:14 PM, Plaintiff was logged out of his CFX.re account.

Plaintiff confronted the Take-Two Interactive employee with a screenshot of being logged out.

At 3:18 PM, the employee "Titanium" confirmed that Plaintiff was logged out because "that's how their software works" while also confirming that there was "no reason for Plaintiff not to be able to access his account or make/edit forum posts," indicating there was no copyright infringement. They had no reason to be accessing the data through a Discord

conversation, especially before filing a DMCA takedown with the Tebex store first as they do not own Tebex. Tebex has requirements for disputes in their creator agreement to keep every developer safe. See. Exhibit N

    - Attached as Exhibit E is a screenshot of this Discord conversation.

    Minutes later, at 3:26 PM, the employee "Titanium" continued to state he needed to see asset IDs for " the resource you sell on Tebex"

    After repeated expressions of privacy concerns and denial of access to assets because the discussion was on Discord and not on Tebex or even CFX.re, as well as "element accounts" being flagged by CFX.re (specifically "Titanium") and shown in the incident report. See. Exhibit F

"We've disabled all of the afore-mentioned element accounts and removed their permissions;" the employee still sent a screenshot at 3:52 PM showing they had accessed the keymaster anyway.

    Upon information and belief, the IP address used by 'Titanium' is linked to Take-Two Interactive, indicating that 'Titanium' was operating from within or under the auspices of Take-Two Interactive. Despite this, Take-Two Interactive has not disclosed the full extent of 'Titanium's' role, employment status, or intentions.  Specifically, whether 'Titanium' was acting under Take-Two's direction during the data breach, and before or after the acquisition of CFX.re. This lack of transparency raises serious concerns about the legitimacy of 'Titanium's' access to my data and the potential implications of their continued involvement with Take-Two Interactive.

- Attached as Exhibit F is the screenshot of the unauthorized access to keymaster and CFX.re data breach announcement

In November 2021, the same Take-Two Interactive employee "Titanium" who accessed Plaintiff's data unauthorized made an announcement as a comment on the post "introducing asset escrow for your resources" stating, "You shouldn't share your forum account with anyone, that's a huge security concern. They will of course have access to any license key, assets, or upvotes tied to your account, and IP locking wouldn't solve that since they would be able to change it too." This demonstrates that they clearly understood unauthorized access prior to accessing Plaintiff's data. Which also predates the incident report with the data breach involving Titanium.

- Attached as Exhibit G is a screenshot of the November 2021 announcement.

After informing Defendant of the lawsuit, Plaintiff's Keymaster and account were locked and access to data/assets protected by keymaster used in Tebex store was suspended as retaliation not because of IP infringement.

Keymaster was never meant to lock people out of their personal assets used in Tebex stores. It was advertised as a safe way to lock your files to stop leakers from leaking your content before Take-Two Interactive's acquisition of the CFX.re forums page. See. Exhibit C All assets Plaintiff made belong to Plaintiff.

- Attached as Exhibit H is evidence of the account lockout and suspension.

## V. LEGAL ARGUMENTS

Count I: Violation of the Computer Fraud and Abuse Act (CFAA)

23.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

24.   Under 18 U.S.C. § 1030, unauthorized access to a protected computer or network constitutes a violation of the CFAA. In this case, Defendant, through its employee known as "Titanium," accessed Plaintiff's protected assets and data without authorization, thereby violating the CFAA.

25.   "Titanium," an employee for Take Two Interactive, demanded access to Plaintiff's asset IDs through a series of persistent requests made during repeated Discord messages. Despite Plaintiff's clear refusal to provide the requested asset IDs and explicit denial of consent to access his assets, "Titanium" continued to demand the information 10 times, which indicates an intentional and unauthorized attempt to access Plaintiff's protected assets.

26.   Following Plaintiff's refusal, "Titanium" proceeded to log Plaintiff out of his CFX.re account without any legal or contractual basis for doing so. This unauthorized access was further evidenced by an IP log and Google alert indicating a suspicious login attempt from an IP address traced back to Take-Two Interactive. See. Exhibit D.

27.   Plaintiff has never consented to any terms or agreements that would authorize Defendant, through "Titanium" or any other Take Two employee, to access Plaintiff's data. No valid terms of service or license agreement were presented or agreed upon that would confer such rights to the Defendant.

28.   The actions of "Titanium," who is associated with a prior data breach incident, clearly constitute unauthorized access. This access was achieved through deceptive and aggressive means, in direct violation of the CFAA. The communication via Discord, an

unofficial and insecure platform, rather than the official forums, further highlights the improper and unauthorized nature of the access.

29.     As a direct result of this unauthorized access, Plaintiff was locked out of his data by Zee, lost control over more than 200 assets, suffered financial losses due to an inability to update these assets, and experienced significant harm to his reputation, mental health, and physical health.

30.     The unauthorized actions of "Titanium," combined with the absence of any legitimate contractual agreement, clearly establish a violation of the CFAA. Plaintiff seeks damages as provided under 18 U.S.C. § 1030 for the unauthorized access to his protected assets on keymaster which is on a protected computer.

**Count II: Breach of Privacy**

31.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

32.     Plaintiff asserts that Defendant's unauthorized access to Plaintiff's account and data constitutes a serious violation of privacy under Colorado common law. This unauthorized access represents an unreasonable intrusion upon Plaintiff's seclusion, a protected interest under the law.

33.     Colorado common law recognizes the right of individuals to be free from intrusions into their personal and private matters. The Defendant's actions, involving the unauthorized access and control of Plaintiff's account, violate this right by gaining access to private and sensitive information without Plaintiff's consent. The mere unauthorized access itself constitutes a breach of Plaintiff's privacy.

34.    The Defendant's actions were deliberate and intentional, as evidenced by the direct and unauthorized access to Plaintiff's data, which was stored in a secure environment intended to protect against such intrusions. This access was achieved without any legitimate justification or legal basis, further exacerbating the violation of Plaintiff's privacy.

35.    The intrusion was highly offensive to Plaintiff, as it involved accessing private digital assets, including proprietary work, emails, passwords, and sensitive source code. This access was not authorized, and Plaintiff did not consent to it, disregarding Plaintiff's right to control their own personal and professional information.

36.    The Defendant's breach of privacy has caused Plaintiff significant harm, including, but not limited to, emotional distress, loss of control over personal data, and potential financial losses due to the unauthorized access to sensitive information. Plaintiff has experienced severe anxiety, loss of sleep, and other stress-related symptoms as a direct result of this breach.

37.    The unauthorized access also damaged Plaintiff's reputation in their professional community, as the access of proprietary work and personal data undermined the trust and confidence that is essential in Plaintiff's industry.

38.    Defendant's actions constitute a willful and wanton disregard for Plaintiff's privacy rights, warranting not only compensatory damages but also punitive damages to deter such egregious conduct in the future.

39.    Plaintiff seeks damages for the harm caused by the breach of privacy, including compensation for emotional distress, loss of reputation, and other related damages as determined by the court.

40.    Plaintiff respectfully asserts that the above allegations sufficiently demonstrate the elements required for a breach of privacy claim under Colorado common law, and therefore seeks appropriate relief as outlined.

**Count III: Consumer Protection Violations**

41.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

42.    Plaintiff asserts a violation of consumer protection laws under the Colorado Consumer Protection Act (CCPA), C.R.S. § 6-1-101 et seq., due to Defendant's deceptive and unfair practices. Defendant used the Keymaster encryption software, which was originally designed to protect assets from leaks, in a manner that deceptively allowed them to access and claim ownership of Plaintiff's data.

43.    This practice is deceptive because Defendant misrepresented the purpose and function of the Keymaster software to the public, leading consumers, including Plaintiff, to believe that their digital assets would be protected from unauthorized access. Instead, Defendant used the software to gain control over these assets, contradicting the purpose for which consumers believed they were using Keymaster. See. Exhibit C

44.    Defendant's deceptive conduct significantly impacts the public, as the Keymaster software is widely used by independent developers to protect their digital assets. The deceptive practice affects all users of  Cfx.re, who rely on the integrity of Keymaster to safeguard their intellectual property. This has the potential to harm a broad spectrum of consumers and developers who are actual or potential users of Defendant's services. Furthermore, if other developers were to lose control over their intellectual property (IP) due to this deceptive practice, Defendant could potentially release these assets in their own downloadable content (DLCs).

45.     Plaintiff has suffered injury in fact to a legally protected interest, specifically the unauthorized access and control over Plaintiff's digital assets. This injury directly stems from Defendant's deceptive practices, as Plaintiff relied on the representation that Keymaster would protect, not expose, their digital property.

46.     The deceptive practice caused Plaintiff's injury by allowing Defendant to wrongfully access and assert ownership over Plaintiff's assets, leading to significant harm in the form of loss of control over intellectual property and financial damages. This practice also threatens other developers with the loss of control over their IP, as Defendant claims they have the ability to modify, reuse, take down, suppress, block, hide, remove, or delete content, which could include reusing these assets in their DLCs

47.     Plaintiff has suffered injury in fact to a legally protected interest, specifically the loss of control over and the inability to monetize Plaintiff's digital assets, which were wrongfully accessed and appropriated by Defendant. The injury also includes the misuse of these assets by Defendant in their downloadable content (DLCs), further depriving Plaintiff of the financial benefits and control over their original work

48.     This injury is compounded by the fact that other users may have similarly lost rights to their digital assets, creating a broader impact that goes beyond Plaintiff's individual case. The potential for Defendant to reuse these assets in their own DLCs or new games such as GTA6 without proper compensation or recognition not only harms the individual creators but also undermines the integrity of the digital marketplace and the value of independent creators' work.

49.     Plaintiff did not agree to any specific terms that would authorize Defendant's actions and does not agree without proper compensation, especially with Plaintiff's knowledge of

other developers being paid such as "NTAuthority" during acquisition.

**Count VI: Violation of Antitrust Laws (Sherman Act and Clayton Act)**

50.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

51.     The Sherman Act (15 U.S.C. § 1) prohibits monopolistic practices and conspiracies to monopolize any part of trade or commerce. Take-Two Interactive, through its acquisition of CFX.re and control over Keymaster, has used its dominant market position to unfairly dominate the market for digital assets created and distributed on the Cfx.re.. By exerting control over the Keymaster system, which developers rely on to protect and distribute their assets, Take-Two Interactive has imposed restrictive conditions that prevent independent developers from competing on a level playing field.

52.     These restrictions constitute an unreasonable restraint of trade because they force developers to either accept terms that grant Take-Two ownership or control over their digital assets or face significant limitations on their ability to distribute and monetize their work independently. This conduct directly stifles competition by eliminating the ability of independent developers to operate without undue influence, thereby creating a monopolistic environment that the Sherman Act seeks to prevent. Defendant's actions have caused significant disruption and distress within the community, impacting numerous developers and users. Plaintiff  has submitted a petition with over 2,000 signatures highlighting the widespread distress caused by these practices after acquisitions. (See Exhibit M).

53.     The Clayton Act (15 U.S.C. § 18) addresses mergers and acquisitions that substantially lessen competition or create a monopoly. Take-Two Interactive's acquisition of CFX.re

and subsequent control over Keymaster has substantially lessened competition in the market by consolidating control over both the platform and the means of asset protection, which has led to a monopoly over digital assets.

54.     After acquiring CFX.re and Keymaster, Take-Two Interactive asserted control over all assets that had been previously purchased and used by developers, retroactively claiming intellectual property rights over these assets. This includes assets that were bought and used on other servers with active daily users. By controlling Keymaster, Take-Two Interactive now claims ownership over all intellectual property associated with these assets, both those acquired before and after their acquisition of CFX.re, thereby extending their monopolistic control over the entire marketplace for these digital assets. Even though before acquisition Cfx.re had no affiliation with Take Two.

55.     Take-Two Interactive's actions have forced terms that grant Take-Two ownership or control over their assets or face restrictions that severely limit their ability to distribute and monetize their work independently. Developers who do not use Keymaster are forced to open-source their work, which exposes their innovations to misappropriation by others without compensation seeing that keymaster is the only approved means of locking assets. This conduct not only harms individual developers but also directly impacts the competitive landscape by stifling innovation and reducing the diversity of available content, which are key concerns under antitrust laws.

56.     The harm suffered by Plaintiff and other developers is precisely the type of injury that the antitrust laws were intended to prevent. The injury is not merely individual or isolated but reflects broader anticompetitive effects that harm the entire market for digital assets.  Take-Two Interactive's monopolistic practices have resulted in a significant reduction in competition, thereby degrading the overall quality, diversity, and innovation of digital assets available to consumers. This reduction in market competition is the exact harm that the Sherman and Clayton Acts are designed to prevent.

57.     Plaintiff is an efficient enforcer of the antitrust laws because the injury suffered is

directly linked to the anticompetitive conduct of Take-Two Interactive. The directness of the injury stemming from the imposition of restrictive terms and the monopolization of the asset protection process places Plaintiff in the ideal position to seek redress and restore competitive conditions in the market. Moreover, Plaintiff's claim does not require complex assessments of market dynamics that would hinder judicial enforcement, making this case a suitable vehicle for the application of antitrust laws.

58.     The consequences of Take-Two Interactive's actions extend beyond individual developers. The company's consolidation of power has created significant barriers to entry for new competitors, reduced the diversity and innovation in digital content available to consumers, and allowed Take-Two Interactive to exploit its dominant position by imposing unfair and unfavorable terms on all users of Cfx.re. By retroactively claiming ownership over assets that were already purchased and in use on other private servers.  Take-Two Interactive has exacerbated its monopolistic control, directly harming the competitive landscape and stifling innovation and diversity within the marketplace.

## Count VIII: Unjust Enrichment

59.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

60.     Plaintiff is the creator and owner of the digital assets under the name LaryGaryMods sold in a Tebex store, which includes the candy cane weapon and the snowball launcher weapon.

61.     Plaintiff invested significant time, effort, and resources in the creation and release of the candy cane weapon on December 12, 2022, at 8:29 PM, and the snowball launcher on November 19, 2023, at 5:50 PM, both of which have been in continuous use since their respective release dates.

62.     Defendant released a Christmas DLC for their game Grand Theft Auto V on December 21, 2022, and another on December 21, 2023, that is identical and substantially similar to Plaintiff's digital assets, including the weapon designs and functions. The candy cane weapon, in particular, was a unique and novel idea as it was used as a weapon instead of its traditional purpose which is to eat the candy cane.  Plaintiff's digital assets were monetized through the Tebex platform, providing Plaintiff with a source of income. Defendant's subsequent release of nearly identical assets in their DLC, without compensating Plaintiff, allowed Defendant to unjustly benefit from Plaintiff's creative work.

63.     Defendant's use of Plaintiff's digital assets directly benefited the Defendant by contributing to the content of their Christmas DLC releases, which were monetized by the Defendant. DLC releases and microtransactions have not only constituted a significant revenue stream for the Defendant but have also grown substantially over time. From 2019 to 2023, the reliance on these sources has increased, with DLCs and microtransactions making up a larger portion of Take-Two's overall revenue.  For instance, in fiscal year 2020, 58% of Take-Two Interactive's revenue came from recurrent consumer spending, which includes microtransactions and DLCs (as reported by Business Wire and Take-Two Corp Profile). This figure increased to 64% in fiscal year 2022 (Take-Two), and by fiscal year 2023, it further grew to 78% (Take-Two). This demonstrates a clear upward trend in the financial significance of DLCs and microtransactions for the Defendant, highlighting how these revenue streams have become increasingly crucial to their business model. See Exhibit O.  Furthermore, Defendant's control over the Keymaster allowed them to access and use Plaintiff's assets without authorization. During the acquisition by Take-Two Interactive, certain developers on the FiveM platform were compensated for their contributions, while others, including Plaintiff, were not. This occurred without any transparent criteria or guidelines for payouts. Such inconsistent treatment

underscores the unjust nature of Defendant's enrichment, as it exploited Plaintiff's creative work and failed to provide fair and equitable compensation across the platform's community of developers.

64.     This benefit was conferred at Plaintiff's expense. Plaintiff invested significant time and resources into the creation and marketing of the digital assets, which were subsequently used by Defendant without permission or compensation. The unauthorized use of Plaintiff's digital assets deprived Plaintiff of the rightful profits and recognition that should have accompanied their original creation and release.

65.     The circumstances under which Defendant utilized Plaintiff's assets make it unjust for Defendant to retain the benefit without providing commensurate compensation. Plaintiff's digital assets were monetized through the Tebex platform, providing Plaintiff with a source of income. Defendant's exploitation of these assets, without any form of compensation or acknowledgment to Plaintiff, constitutes unjust enrichment.

66.     It is noteworthy that other developers on the same platform, Cfx.re, have been compensated for their contributions, as a part of the acquisition.  While others, including Plaintiff, have not received any payment. Plaintiff has created over 200 assets, ranging from MLOs to clothing and scripts. Many of these assets are now inaccessible to Plaintiff due to Defendant's actions, and some are currently being used in Defendant's DLC releases.  The lack of clear criteria or consistency in compensating developers who significantly contribute to the platform's success further underscores the unjust nature of Defendant's enrichment. Therefore, if compensation is deemed appropriate for other developers, Plaintiff should be equally entitled to remuneration. The criteria for such payouts should be clearly established, taking into account the impact and value of the contributions made by each and every developer.

67.     As a direct and proximate result of Defendant's unjust enrichment,

Plaintiff has suffered and will continue to suffer substantial damages, including, but not limited to, lost profits and harm to Plaintiff's reputation, physical and mental harm. Plaintiff is entitled to restitution of the profits unjustly accrued by Defendant through the unauthorized use of Plaintiff's digital assets, in an amount to be determined by the courts.

68.    Moreover, Plaintiff asserts that he never consented to any terms that would confer upon Defendant the right to utilize Plaintiff's content.

## VI. DAMAGES BREAKDOWN WITH LEGAL REFERENCES AND JUSTIFICATIONS

**Compensatory Damages**:

69.    **Direct Financial Losses: Determined by the Court**

**Legal Basis:** General compensatory damages under common law for economic losses resulting from tortious conduct, including unjust enrichment.

**Justification:** Plaintiff does not request a specific amount for unjust enrichment but provides the following facts for the court to determine appropriate restitution:

70.    **Defendant's Revenue from DLCs:** Publicly available information indicates that Defendant generates significant  revenue daily from downloadable content (DLCs), which included content alleged to have been derived from Plaintiff's digital assets.  This structure ensures that the total requested amount of $1,250,000 million is justified, compliant with relevant federal and state laws, and provides clear, specific legal bases for each category of damages.

71.    **Duration of Use:** Plaintiff asserts that Defendant used Plaintiff's digital assets in their DLCs for a total period of approximately 60 days over two years. GTA Online restricts the use of Christmas DLC assets to the holiday period each year, meaning Defendant benefited from the unauthorized use of Plaintiff's content for about 30 days each year. This consistent and

repeated use of the assets across two holiday periods before and after acquisition reflects the ongoing benefit derived by the Defendant from the Plaintiff's work.

72.     **Court's Discretion:** Plaintiff requests that the court determine the appropriate amount of restitution for unjust enrichment, taking into account the duration of use and the significant daily revenue generated by Defendant. Plaintiff seeks restitution based on the benefit conferred upon Defendant, as the assets provided value to the Defendant's DLC offerings.

**Statutory Damages**:

73.     **Under CFAA (18 U.S.C. § 1030): $100,000**

**Legal Basis:** The Computer Fraud and Abuse Act provides for civil remedies, including compensatory damages for unauthorized access to protected computer systems.

**Justification:** Plaintiff seeks damages under the CFAA for unauthorized access to protected computer systems, covering both direct losses and consequential damages. This includes lost profits, reputational harm, physical and mental harm and costs associated with responding to unauthorized access.

74.     **Under Colorado Common Law: $50,000**

**Legal Basis:** Colorado common law permits damages for violations of privacy rights, including unauthorized access to personal data.

**Justification:** Plaintiff seeks compensatory damages for actual harm suffered, including economic loss and emotional distress due to the Defendant's unauthorized access to Plaintiff's personal data. Plaintiff also seeks punitive damages to deter similar future conduct.

75.     **Under Colorado Consumer Protection Act (C.R.S. § 6-1-113): $50,000**

**Legal Basis:** The Colorado Consumer Protection Act allows for statutory damages for deceptive trade practices.

**Justification:** Plaintiff seeks damages for Defendant's deceptive and unfair business practices, which misled consumers about the protection of their digital assets. The act aims to protect consumers from fraudulent and misleading actions, ensuring Plaintiff is compensated for losses suffered due to Defendant's practices.

76.    **Total Statutory Damages: $200,000**

**Punitive Damages:**

77.    **Amount Requested: $650,000**

**Legal Basis:** C.R.S. § 13-21-102 permits punitive damages in cases of willful and wanton misconduct.

**Justification:** As detailed in paragraphs 8-12, 14-15, 22, 25-26, 28-30, and 38 of the complaint, the Defendant's actions were willful, wanton, and malicious. Specifically:

78.    **Paragraphs 8-12** describe how "Titanium," an employee of Take-Two Interactive, accessed Plaintiff's assets without consent, using deceptive tactics and unauthorized methods, such as asking for asset IDs through Discord, logging the Plaintiff out of his account, and restricting access to Plaintiff's data.

79.    **Paragraph 14** discusses the severe anxiety, loss of sleep, and stress-induced physical symptoms experienced by the Plaintiff as a result of the Defendant's actions, which are directly related to the emotional distress and pain and suffering claims.

80.    **Paragraph 15** details the financial harm caused by the lockout of Plaintiff's

assets, which includes lost revenue and damage to the Plaintiff's reputation in the digital asset community. This further establishes the intent to harm Plaintiff's business.

81.     **Paragraph 22** discusses the sequence of events during the unauthorized access and retaliatory lockout of the Plaintiff's account, demonstrating the calculated intent and harmful nature of the Defendant's actions.

82.     **Paragraphs 25-26** outline how, despite Plaintiff's refusal to provide access to his assets, "Titanium" persisted in demanding access, and upon refusal, took retaliatory actions by logging the Plaintiff out of his account without any legal or contractual basis.

83.     **Paragraph 28** highlights that these actions were done using an insecure platform (Discord) rather than the official forums, further evidencing the improper and unauthorized nature of the access.

84.     **Paragraph 29** states the direct harm caused to Plaintiff, including loss of access to assets, financial losses, and significant harm to reputation, as well as to Plaintiff's mental and physical health.

85.     **Paragraph 30** directly links the unauthorized actions to significant harm to Plaintiff's reputation and mental health, reinforcing the severity of the impact.

86.     **Paragraph 38** emphasizes the willful and wanton disregard for Plaintiff's privacy rights, warranting punitive damages to deter such egregious conduct in the future.


**Emotional Distress and Pain and Suffering:**


87.     **Non-Economic Damages: $400,000**

**Legal Basis:** Common law tort claims for emotional distress, including intentional infliction of emotional distress (IIED), provide for recovery of non-economic damages.

**Justification:** Plaintiff, who suffers from PTSD, has experienced severe emotional distress due to the Defendant's actions, which have disrupted his therapeutic activities and community support. Plaintiff's pain journal documents the emotional and physical impact, including increased anxiety, jaw pain, and sleep disturbances. Colorado law caps non-economic damages at $613,760, with a potential increase to $1,227,530 upon clear and convincing evidence.

## Total Damages Requested (Excluding Unjust Enrichment): $1,250,000

**Note:** The amount for unjust enrichment is to be determined by the court, considering the duration and nature of the Defendant's unauthorized use of Plaintiff's digital assets.

## VII. PROCEDURAL REQUIREMENTS

**Certificate of Conferral**

88.     Pursuant to Rule 121, Section 1-15(8) of the Colorado Rules of Civil Procedure, Plaintiff certifies that he attempted to confer with Defendant's counsel regarding the issues presented in this motion but was unable to resolve the matters in dispute.

## Certificate of Service

89.     I HEREBY CERTIFY that on Aug  25th, 2024, a true and correct copy of the foregoing AMENDED COMPLAINT was sent mailed via e-mail to the following and updated on pacer:


- Carolyn Juarez, Neugeboren O'Dowd PC, 726 Front St., Ste. 220, Louisville, CO 80027, Email:  Carolyn@nodiplaw.com


## VIII. REQUESTED RELIEF

90. For the reasons stated above, Plaintiff respectfully requests that this Court grant leave for this case to proceed to discovery, ensuring a full examination of the facts and evidence.

91. Plaintiff further requests the following relief:

**Compensatory Damages:**

92. **Direct Financial Losses:** To be determined by the Court based on the facts presented regarding unjust enrichment, including Defendant's daily revenue from DLCs and the duration of unauthorized use of Plaintiff's digital assets.

**Statutory Damages:**

93. **Under CFAA (18 U.S.C. § 1030):** $100,000

94. **Under Colorado Common Law:** $50,000

95. **Under Colorado Consumer Protection Act (C.R.S. § 6-1-113):** $50,000

96. **Total Statutory Damages:** $200,000

**Punitive Damages:**

97. **For Willful and Malicious Conduct:** $650,000

**Emotional Distress and Pain and Suffering:**

98. **Non-Economic Damages:** $400,000

99. **Any other relief the Court deems just and proper.**

## Total Requested Relief (Excluding Unjust Enrichment): $1,250,000

**Note:** The total requested relief amount excludes any additional restitution for unjust enrichment, which is to be determined by the Court based on the duration and nature of Defendant's unauthorized use of Plaintiff's digital assets.

## EXHIBITS

- **Exhibit A**: Screenshot showing account creation date on CFX.re.

- **Exhibit B**: Screenshot of the Tebex user agreement.

- **Exhibit C**: Screenshot of partnership agreement announcement on CFX.re of the partnership with Tebex.

- **Exhibit D**: IP log and Google alert indicating unauthorized access.

- **Exhibit E**: Screenshot of Discord conversation.

- **Exhibit F**: Screenshot provided by the Take-Two Interactive employee confirming unauthorized access to keymaster and CFX.re data breach announcement.

- **Exhibit G**: Screenshot of the November 2021 announcement.

- **Exhibit H**: Evidence of the account lockout/suspension.

- **Exhibit I**: Examples and comparisons of Plaintiff's work to Defendant's DLC releases.

- **Exhibit J**: Shows the relevant "Releases Rules and FAQ" as displayed on the CFX forums page.

- **Exhibit K**: Shows the statement made by Zee, "Don't come at me with baseless legal threats and expect to walk away from it."

- **Exhibit L**: Further confirms Zee's involvement with Titanium's statement, "I can see the flagged issue from Zee."

- **Exhibit M**: Petition with over 2,000 signatures highlighting the widespread distress caused by these practices.

- **Exhibit N**: Tebex Terms showing DMCA must be filed, providing evidence of the lack of DMCA takedown notice filed by Defendant, and showing the terms of service with Tebex stating DMCA must be filed.

- **Exhibit O**: Links to websites showing the substantial revenue contribution from DLCs and microtransactions. In fiscal year 2020, 58% of Take-Two Interactive's revenue came from recurrent consumer spending, including microtransactions and DLCs (Metro). This increased to 64% in fiscal year 2022 (Business Wire, Take-Two Interactive), and 78% in fiscal year 2023 (Take-Two Interactive, VG247). This trend underscores the growing importance of these revenue streams for the Defendant's business model.

Respectfully submitted,

*Colton John Harris*

Colton John Harris

3100 Wood Ave, Lot G17

Colorado Springs, CO 80907

Email: thecoltonjohn@gmail.com

DATED: [8-25-2024]