# EXHIBIT 1

**2024 WL 5230126**

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. A PETITION FOR REHEARING IN THE COURT OF APPEALS OR A PETITION FOR CERTIORARI IN THE SUPREME COURT MAY BE PENDING.

Colorado Court of Appeals, Division I.

Alim AL-HAMIM, Plaintiff-Appellant,
v.
STAR HEARTHSTONE, LLC, and
IRT Living, Defendants-Appellees.

Court of Appeals No. 24CA0190
|
Announced December 26, 2024

**Synopsis**
**Background:** Self-represented tenant brought action against landlords, asserting breach of warranty of habitability and breach of covenant of quiet enjoyment, among other claims, arising from landlords' purported failure to remedy alleged contamination of carpet with cat hair and urine. The District Court, Arapahoe County, Elizabeth Beebe Volz, J., granted landlords' motion to dismiss for failure to state a claim. Tenant appealed.

**Holdings:** The Court of Appeals, Lipinsky, J., held that:

[1] tenant did not state cause of action that landlords breached of warranty of habitability;

[2] tenant did not state cause of action for breach of covenant of quiet enjoyment; and

[3] as matter of first impression, no sanctions were warranted against tenant, even though tenant violated appellate briefing rules by submitting appellate brief containing hallucinations in form of citations to non-existent cases produced by generative artificial intelligence (GAI).

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

West Headnotes (19)

[1]  **Attorneys and Legal Services** ⟜ Role of court in general
**Pleading** ⟜ Pro se or lay pleadings
When a party represents himself throughout a case, the court must liberally interpret his pleadings.

[2]  **Attorneys and Legal Services** ⟜ Procedural matters in general
A party's status as a self-represented litigant does not excuse his noncompliance with the procedural rules that all parties, whether or not represented by counsel, must follow.

[3]  **Appeal and Error** ⟜ Review using standard applied below
The Court of Appeals reviews a motion to dismiss for failure to state a claim de novo and applies the same standards as the trial court. Colo. R. Civ. P. 12(b)(5).

[4]  **Pretrial Procedure** ⟜ Matters not admitted
Court is not required to accept bare legal conclusions as true when considering a motion to dismiss for failure to state a claim. Colo. R. Civ. P. 12(b)(5).

[5]  **Appeal and Error** ⟜ Failure to State Claim, and Dismissal Therefor
As a general rule, the Court of Appeals will uphold the grant of a motion to dismiss for failure to state a claim only when the plaintiff's factual allegations do not, as a matter of law, support the claim for relief. Colo. R. Civ. P. 12(b)(5).

[6]  **Landlord and Tenant**  Warranty of habitability

Tenant who alleged that his landlords breached warranty of habitability by failing to replace apartment carpeting purportedly contaminated with cat hair and urine failed to allege that he was unable to use bedroom in which carpet was located or that he experienced problems that made apartment uninhabitable under statutes defining "uninhabitable," and thus, tenant did not state cause of action that apartment was uninhabitable in breach of warranty. Colo. Rev. Stat. Ann. §§ 38-12-503(2)(a)(I), 38-12-505(1) (2023).

[7]  **Landlord and Tenant**  Warranty of habitability

Tenant's allegations that he began to show signs of allergic reaction on day he moved into his apartment after emptying vacuum canister purportedly filled with cat hair and that bedroom carpet had odor and stains of cat urine did not amount to material interference with tenant's life, health, or safety, as would have resulted in breach of warranty of habitability by landlords, absent indication that allergic reaction continued past day he vacuumed carpet or that purported smells and stains impacted his health in any other manner. Colo. Rev. Stat. Ann. § 38-12-503(2)(a)(II).

[8]  **Landlord and Tenant**  Right of entry and possession of tenant

**Landlord and Tenant**  Express and implied covenants

In the absence of an agreement to the contrary, there is an implied covenant for the quiet enjoyment of the leased premises and the tenant is entitled to the possession of the premises to the exclusion of the landlord.

[9]  **Landlord and Tenant**  What constitutes breach of covenant

The covenant of quiet enjoyment is breached by any disturbance of a lessee's possession by his lessor which renders the premises unfit for occupancy for the purposes for which they were leased, or which deprives the lessee of the beneficial enjoyment of the premises, causing him to abandon them.

[10]  **Landlord and Tenant**  What constitutes breach of covenant

Although abandonment is not a required element of the breach of the covenant of quiet enjoyment, to establish a breach of the covenant, a plaintiff must establish that the disturbance of the lessee's possession by his lessor rendered the premises unfit for the purposes for which they were leased.

[11]  **Landlord and Tenant**  What constitutes breach of covenant

Tenant who alleged that his landlords breached covenant for quiet enjoyment by failing to replace apartment carpeting purportedly contaminated with cat hair and urine failed to allege that carpet rendered any part of premises unusable or unfit for occupancy or that carpet condition resulted in constructive eviction, and thus, tenant did not state cause of action for breach of quiet enjoyment against landlords.

[12]  **Appeal and Error**  Necessity of presentation in general

Court of Appeals would not consider claims tenant raised for first time on appeal, in tenant's appeal of landlords' motion to dismiss granted by trial court, where tenant did not plead such claims in his complaint.

[13]  **Appeal and Error**  Necessity of presentation in general

In civil cases, issues not raised in or decided by trial court generally will not be addressed for first time on appeal.

[14] **Attorneys and Legal Services** Meritorious claims and contentions

**Attorneys and Legal Services** Filings and Other Submissions

Individuals using the current generation of general-purpose generative artificial intelligence (GAI) tools to assist with legal research and drafting must be aware of the tools' propensity to generate outputs containing fictitious legal authorities and must ensure that such fictitious citations do not appear in any court filing.

[15] **Attorneys and Legal Services** Procedural matters in general

A pro se litigant who chooses to rely upon his own understanding of legal principles and procedures is required to follow the same procedural rules as those who are qualified to practice law and must be prepared to accept the consequences of his mistakes and errors.

[16] **Appeal and Error** Points and arguments

The submission of a brief containing hallucinations produced by generative artificial intelligence (GAI) runs afoul of the appellate briefing rule governing the arguments in opening briefs. Colo. App. R. 28(a)(7)(B).

[17] **Costs, Fees, and Sanctions** Briefs and memoranda

No sanctions were warranted against self-represented tenant, on tenant's appeal of trial court's grant of landlords' motion to dismiss, even though tenant violated appellate briefing rules by submitting appellate brief containing hallucinations in form of citations to non-existent cases produced by generative artificial intelligence (GAI); consideration of sanctions based on such facts was issue of first impression, tenant had not previously filed court documents containing fake citations, landlords neither alerted court of hallucinations nor sought award of attorney fees against tenant for rule violation, and in response to show cause order, tenant acknowledged his use of GAI, apologized for his mistake, and accepted responsibility for including hallucinations. Colo. App. R. 28(a)(7)(B), 38(a), 39.1.

[18] **Appeal and Error** Defects, objections, and amendments

Even if sanctions against a self-represented litigant are not warranted, the litigant's inclusion of hallucinations produced by generative artificial intelligence (GAI) in his original appellate brief does not entitle him to a second opportunity to file an opening brief in the form of an amended brief.

[19] **Costs, Fees, and Sanctions** Grounds

A lawyer's or a self-represented party's filing in the Court of Appeals containing hallucinations generated by generative artificial intelligence (GAI) may result in sanctions.

Arapahoe County District Court No. 23CV198, Honorable Elizabeth Beebe Volz, Judge

**Attorneys and Law Firms**

Alim Al-Hamim, Pro Se

Gordon Rees Scully Mansukhani LLP, John R. Mann, Greg S. Hearing II, Brittney T. Bulawa, Denver, Colorado, for Defendants-Appellees

**Opinion**

Opinion by JUDGE LIPINSKY

*1 ¶ 1 The recent advances in artificial intelligence (AI), and particularly generative artificial intelligence (GAI), technology have impacted nearly every aspect of our lives, including the creation of text. A GAI tool can produce output that resembles the work of a human author. It is becoming increasingly difficult to determine whether a human or a GAI tool created a particular document.

¶ 2 Despite their uncanny writing skills, most commonly used GAI tools are currently unable to draft motions, briefs, and other legal documents because they were not designed for this purpose and cannot conduct legal research. For this reason, a person unfamiliar with the limitations of GAI tools can unwittingly rely on them to produce what appears to be text filled with citations to legal authorities. But these citations may be fictitious. Case names and citations that a GAI tool makes up are known as "hallucinations." *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1230 (11th Cir. 2024) (Newsom, J., concurring) (A GAI tool " 'hallucinates' when, in response to a user's query, it generates facts that, well, just aren't true — or at least not *quite* true."); Matthew R. Caton, *Lawyers: Rely on 'Generative AI' at Your Peril,* 39 Me. Bar J. 48, 48 (2024) (A GAI hallucination "occurs when an AI system provides information that is inaccurate or, more bluntly, fake.").

¶ 3 Some self-represented litigants, including plaintiff, Alim Al-Hamim, have relied on GAI tools to draft court filings, only to discover later to their chagrin that their filings contained hallucinations. Al-Hamim's opening brief in this appeal contained hallucinations, as well as bona fide legal citations. This case provides the first opportunity for a Colorado appellate court to address the appropriate sanction when a self-represented litigant files a brief peppered with GAI-produced hallucinations.

 *2  ¶ 4 Al-Hamim appeals the district court's dismissal of his claims for breach of the warranty of habitability and the implied covenant of quiet enjoyment for failure to state a claim under C.R.C.P. 12(b)(5) that he asserted against defendants, Star Hearthstone, LLC and IRT Living (jointly, the landlords). We affirm the court's judgment against Al-Hamim and put him, the bar, and self-represented litigants on notice that we may impose sanctions if a future filing in this court cites "non-existent judicial opinions with fake quotes and citations." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023) (holding that attorneys "abandoned their responsibilities when they submitted non-existent judicial opinions with fake quotes and citations created by the artificial intelligence tool ChatGPT").

I. Background

¶ 5 Star Hearthstone rented an apartment to Al-Hamim and his cotenants in April 2020. Al-Hamim alleged in his complaint that IRT Living managed the apartment complex for a portion of the time he rented the apartment.

¶ 6 Al-Hamim pleaded that, in early 2021, shortly after he moved into the apartment, he "noticed a full cannister of dander and cat hair after vacuuming both bedrooms." He "surmised it was cat or some other animal hair when [he] began to show signs of an allergic reaction." Al-Hamim also alleged that "the wooden carpet tack strips around the edges in [his] bedroom closet, as well as the actual carpet pad and carpet underside were visibly stained from cat urine."

¶ 7 Al-Hamim said in his complaint that he reported the condition of his carpet to the property manager, who had the carpet cleaned. Al-Hamim alleged that, following the cleaning, he noticed "the strong ammonia smell of cat urine" in his bedroom and "suggested to management that the carpet may need replacement." Although the property manager responded that the carpet "would be replaced, as soon as possible," the carpet was not replaced.

¶ 8 Al-Hamim asserted that "[n]early an entire year passed with no action on the part of [the landlords]" and that he "still had not actually moved into and settled into the premises." However, despite his concerns about the cat urine odor and carpet stains, Al-Hamim renewed his lease through mid-2023.

¶ 9 Al-Hamim pleaded claims for (1) breach of the warranty of habitability; (2) breach of the covenant of quiet enjoyment; (3) violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213; (4) violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x; and (5) violation of the Equal Protection and Due Process Clauses of the United States and Colorado Constitutions, U.S. Const. amend. XIV; Colo. Const. art. II, §§ 6, 25. The landlords filed a motion to dismiss under C.R.C.P. 12(b)(5) for failure to state claims upon which relief can be granted. The court granted the motion.

II. The Court Did Not Err by Dismissing the Case

¶ 10 Al-Hamim contends that the court erred by granting the landlords' motion to dismiss. Specifically, he argues that the court erred by determining that the landlords did not breach the warranty of habitability and the implied covenant of quiet enjoyment. Additionally, he asserts that the court improperly failed to consider four of his other claims.

A. Standard of Review

**[1]** **[2]** ¶ 11 Because Al-Hamim represented himself throughout the case, we must liberally interpret his complaint and response to the landlords' dismissal motion. *See People v. Bergerud*, 223 P.3d 686, 697 (Colo. 2010). But Al-Hamim's status as a self-represented litigant does not excuse his noncompliance with the procedural rules that all parties, whether or not represented by counsel, must follow. *See In re Marriage of Wright*, 2020 COA 11, ¶ 33, 459 P.3d 757, 764.

**\*3** **[3]** **[4]** **[5]** ¶ 12 "We review a C.R.C.P. 12(b)(5) motion to dismiss de novo and apply the same standards as the trial court." *Norton v. Rocky Mountain Planned Parenthood, Inc.*, 2018 CO 3, ¶ 7, 409 P.3d 331, 334. In doing so, we accept all factual allegations in the complaint as true and view them in the light most favorable to the nonmoving party to determine whether the plaintiff has alleged "sufficient facts that, if taken as true, show plausible grounds to support a claim for relief." *Jagged Peak Energy Inc. v. Okla. Police Pension & Ret. Sys.*, 2022 CO 54, ¶ 25, 523 P.3d 438, 446 (citing *Warne v. Hall*, 2016 CO 50, ¶¶ 9, 24, 373 P.3d 588, 591, 595). "[W]e are not required to accept bare legal conclusions as true." *Norton*, ¶ 7, 409 P.3d at 334. As a general rule, "[w]e will uphold the grant of a C.R.C.P. 12(b)(5) motion only when the plaintiff's factual allegations do not, as a matter of law, support the claim for relief." *Id.*

B. Warranty of Habitability

¶ 13 "In every rental agreement, the landlord is deemed to warrant that the residential premises is fit for human habitation." § 38-12-503(1), C.R.S. 2023. (The Colorado General Assembly amended the warranty of habitability statute in 2024. *See* Ch. 158, secs. 3, 5, §§ 38-12-503, -505, 2024 Colo. Sess. Laws 704-17. We cite the version of the statute in effect when Al-Hamim filed his complaint. Because the General Assembly considers "premises" to be a singular noun, so do we.)

¶ 14 A landlord breaches the warranty of habitability if the residential premises is (1) "[u]ninhabitable," as defined in section 38-12-505, C.R.S. 2023, § 38-12-503(2)(a)(I); or (2) "[i]n a condition that materially interferes with the tenant's life, health, or safety," § 38-12-503(2)(a)(II). Section 38-12-505(1) lists the conditions that render a residential premises "uninhabitable." These conditions include lack of heating, lack of running water, and lack of working locks, but not animal odors or urine stains.

**[6]** ¶ 15 Al-Hamim argues in his opening brief that the landlords breached the warranty of habitability by failing to replace the carpeting in his apartment. Specifically, he asserts that his "inability to use his bedroom due to severe allergies" constituted the breach. In his complaint, however, he did not allege that he was unable to use the bedroom. Further, in his opening brief, Al-Hamim does not cite any authority indicating that the problems he experienced at the apartment made it "uninhabitable" within the meaning of sections 38-12-503(2)(a)(I) and 38-12-505(1).

**[7]** ¶ 16 Nor did Al-Hamim allege a plausible claim that the conditions at the apartment materially interfered with his "life, health, or safety." § 38-12-503(2)(a)(II). We focus on the "health" prong of the statute because Al-Hamim did not allege that the cat odor or urine stains affected his life or safety. Viewing the allegations in the complaint in the light most favorable to Al-Hamim, *see Jagged Peak Energy Inc.*, ¶ 25, 523 P.3d at 446, his allegation that the cat urine smell and stains impacted his health rested on his assertion that he "began to show signs of an allergic reaction when emptying the [vacuum] canister" on the day he moved in. He did not allege in his complaint that the "signs of an allergic reaction" materially impacted his health, that the allergic reaction continued past the day he vacuumed the carpet, or that the smell and stains impacted his health in any other manner. *Cf. Anderson v. Shorter Arms Invs., LLC*, 2023 COA 71, ¶ 29, 537 P.3d 831, 837 (recognizing that unremedied mold can interfere with a tenant's life, health, or safety under section 38-12-503(2)(a)(II)); *Kekllas v. Saddy*, 88 Misc.2d 1042, 389 N.Y.S.2d 756, 758 (Nassau Cnty. Dist. Ct. 1976) (holding that an odor of cat urine that permeated the entire premises, forcing the tenant to vacate the premises due to nausea and burning eyes, combined with rusty water, leaks, and stuck windows, resulted in a breach of the warranty of habitability).

**\*4** ¶ 17 For these reasons, we hold that the court did not err by concluding that Al-Hamim failed to plead an actionable claim for breach of the warranty of habitability.

C. Implied Covenant of Quiet Enjoyment

**[8]** **[9]** **[10]** ¶ 18 "[I]n the absence of an agreement to the contrary, there is an implied covenant for the quiet enjoyment

of the leased premises and the tenant is entitled to the possession of the premises to the exclusion of the landlord." *Radinsky v. Weaver*, 460 P.2d 218, 220 (Colo. 1969). The covenant of quiet enjoyment is breached by "any disturbance of a lessee's possession by his lessor which renders the premises unfit for occupancy for the purposes for which they were leased, or which deprives the lessee of the beneficial enjoyment of the premises, causing him to abandon them." *W. Stock Ctr., Inc. v. Sevit, Inc.*, 578 P.2d 1045, 1051 (Colo. 1978) (quoting *Radinsky*, 460 P.2d at 220). Although "abandonment is not a required element of the breach of the covenant of quiet enjoyment," *Isbill Assocs., Inc. v. City & Cnty. of Denver*, 666 P.2d 1117, 1120 (Colo. App. 1983), *disapproved of on other grounds by Goodyear Tire & Rubber Co. v. Holmes*, 193 P.3d 821 (Colo. 2008), to establish a breach of the covenant, the plaintiff must establish that the "disturbance of [the] lessee's possession by his lessor" rendered the premises "unfit ... for the purposes for which they were leased." *W. Stock Ctr., Inc.*, 578 P.2d at 1051 (quoting *Radinsky*, 460 P.2d at 220).

 **[11]**  ¶ 19 Al-Hamim alleged that "[t]he landlord[s'] refusal to replace the cat-urine-stained carpet, despite repeated complaints ..., resulted in a significant disruption to [his] quiet enjoyment of the apartment." He asserted that the landlords breached the implied covenant of quiet enjoyment because the issues involving the carpet resulted in "inconvenience and strain" on his friendships with his cotenants, and that he and his cotenants "had not actually moved into and settled into the premises" during the first year of the lease.

¶ 20 It is unclear from Al-Hamim's complaint the extent to which the condition of the carpet interfered with his quiet enjoyment of the premises, as opposed to his relationship with his cotenants, however. Al-Hamim did not allege that he was unable to use any part of the premises due to the carpet's condition. Rather, Al-Hamim said that he refrained from moving items into his apartment because he did not want to have to move them again when the carpet was replaced, not because any room was unfit for occupancy. (In his response to the landlords' motion to dismiss and in the opening brief, Al-Hamim argued that the carpet problems prevented him from using his bedroom. However, he did not include this allegation in his complaint and, therefore, we do not consider it. *See Norton*, ¶ 7, 409 P.3d at 334 ("When considering a motion to dismiss for failure to state a claim, we may consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference, and matters proper for judicial notice.").)

¶ 21 Further, Al-Hamim does not cite any legal authority holding that a strain on cotenants' relationships can result in a breach of the implied covenant of quiet enjoyment. Nor did Al-Hamim allege that the carpet odor and staining resulted in a constructive eviction. To the contrary, Al-Hamim conceded in his complaint that he renewed the lease despite his complaints about the carpet. For these reasons, Al-Hamim did not allege the type of "disturbance of ... possession" that could render the apartment unfit for "the purposes for which [it was] leased." *W. Stock Ctr., Inc.*, 578 P.2d at 1051 (quoting *Radinsky*, 460 P.2d at 220).

 **\*5**  ¶ 22 Accordingly, we conclude that Al-Hamim failed to state a claim for breach of the implied covenant of quiet enjoyment.

### D. Other Issues

 **[12]**  ¶ 23 Al-Hamim raises the following claims for the first time in his opening brief:

- The landlords "breached the lease agreement and the implied covenant of good faith and fair dealing by failing to resolve maintenance issues and by conducting arbitrary credit checks."

- "[T]he leasing agent made fraudulent representations regarding the credit check process and the legality of a durable power of attorney used by [Al-Hamim] to sign for his guarantors."

- Al-Hamim "suffered considerable harm as a result of the landlord[s']" negligence.

- The landlords' replacement of the carpet "constitute[d] an implicit acknowledgement by the landlord[s] of their responsibility to address the habitability issue initially reported by the tenant."

 **[13]**  ¶ 24 We do not consider these claims, however, because Al-Hamim did not plead them in his complaint. "It is axiomatic that in civil cases, issues not raised in or decided by the trial court generally will not be addressed for the first time on appeal." *Brown v. Am. Standard Ins. Co. of Wis.*, 2019 COA 11, ¶ 21, 436 P.3d 597, 600.

### III. Court Filings with GAI-Produced Hallucinations

A. The Hallucinations in Al-Hamim's Opening Brief

¶ 25 Al-Hamim's opening brief contains citations to the following fake cases:

- *Beck v. Tibbetts*, 967 P.2d 150 (Colo. 1998);

- *Jankowski v. Cross*, 672 P.2d 1178 (Colo. App. 1983);

- *L&M Inv. Co. v. Morrison*, 469 P.2d 516 (Colo. App. 1970);

- *Jaramillo v. Cowen*, 768 P.2d 1378 (Colo. App. 1989);

- *In re Estate of Henry*, 2012 COA 169, 301 P.3d 107 (Colo. App. 2012);

- *Jaramillo v. Steiner*, 212 P.3d 1188 (Colo. App. 2009);

- *Rojas v. Lindsay Mfg. Co.*, 108 Cal. App. 4th 530 (2003); and

- *Robinson v. Lennox Hill Hospital*, 513 N.Y.S.2d 607 (App. Div. 1987).

¶ 26 After we attempted, without success, to locate these cases, we ordered Al-Hamim to provide complete and unedited copies of the cases, or if the citations were GAI hallucinations, to show cause why he should not be sanctioned for citing fake cases. In his response to our show cause order, Al-Hamim admitted that he relied on AI "to assist his preparation" of his opening brief, confirmed that the citations were hallucinations, and that he "failed to inspect the brief." He did not address why he should not be sanctioned.

B. The Risks of Relying on a
GAI Tool to Draft a Court Filing

¶ 27 To explain why a GAI tool can produce legal documents filled with hallucinations, we briefly review the large language model (LLM) underlying GAI technology.

¶ 28 GAI tools are trained using LLMs that, "through a form of machine learning known as deep learning, teach the program how characters, words, and sentences function together." Maria E. Berkenkotter & Lino S. Lipinsky de Orlov, *Can Robot Lawyers Close the Access to Justice Gap? Generative AI, the Unauthorized Practice of Law, and Closing the Access to Justice Gap*, 53 Colo. Law. 40, 42 (2024) (hereinafter, *Access to Justice*). An LLM "learns what words are most likely to appear where, and which ones are most likely to precede or follow others — and by doing so, it can make probabilistic, predictive judgments about ordinary meaning and usage." *Snell*, 102 F.4th at 1226 n.7 (Newsom, J., concurring). This training allows the GAI tool to "generate content, such as words, images, and a command in a line of code, autonomously in response to prompts." *Access to Justice*, 53 Colo. Law. at 42.

*6 ¶ 29 The limitations of and biases contained in the materials used to train an LLM can produce outputs that reflect the shortcomings in the LLM's training. As of mid-2024, popular GAI tools, such as OpenAI's GPT-4, were not "trained with data sets containing comprehensive, accurate legal resources." *Id.* These widely used resources are "not consistently reliable legal research tools because they do not always provide the correct answers to legal queries and may even make up case names and citations when they do not know the answer to a question." *Id.*

¶ 30 A GAI system "can generate citations to totally fabricated court decisions bearing seemingly real party names, with seemingly real reporter, volume, and page references, and seemingly real dates of decision[ ]." Caton, 39 Me. Bar J. at 49 (quoting *Smith v. Farwell*, No. 2282CV01197, at *1, 9, 2024 WL 4002576 (Mass. Super. Ct. Feb. 12, 2024) (unpublished order), https://perma.cc/59CV-C77W). These hallucinations "can relate, in whole or in part, to the case name, case citation, and/or the content or holding of a fake case or a real judicial decision." *Id.*; *see also* Eve Ross & Amy Milligan, *What Can ChatGPT Do, and Should We Let It?*, 34 S.C. Law. 34, 36 (2023) ("ChatGPT may confidently include authorities in its responses that are misleading, incorrect or simply made up.... Unfortunately, ChatGPT doesn't always specify what sources it relies on for its responses."); Nicole J. Benjamin, *Artificial Intelligence and the Future of the Practice*, 72 R.I. Bar J. 3, 3 (2024) ("AI 'hallucinations' — including the unforgiveable creation of case law — and the generation of inaccurate answers are enough to give us all pause when it comes to the adoption of artificial intelligence in the practice."); Sadie O'Connor, *Generative AI*, 8 Geo. L. Tech. Rev. 394, 401 (2024) ("Since GAI algorithms are capable of 'hallucinating' false information, users must be cautious of its limitations.").

¶ 31 "Many harms flow from the submission of fake opinions." *Mata*, 678 F. Supp. 3d at 448. These include wasting the opposing party's "time and money in exposing

the deception," taking the court's time "from other important endeavors," and potentially harming the reputations of "judges and courts whose names are falsely invoked as authors of the bogus opinions" and the reputation of "a party attributed with fictional conduct." *Id.* Moreover, "a future litigant may be tempted to defy a judicial ruling by disingenuously claiming doubt about its authenticity." *Id.* at 448-49.

¶ 32 Accordingly, using a GAI tool to draft a legal document can pose serious risks if the user does not thoroughly review the tool's output. Reliance on a GAI tool not trained with legal authorities can "lead both unwitting lawyers and nonlawyers astray." *Access to Justice*, 53 Colo. Law. at 43. A self-represented litigant may not understand that a GAI tool may confidently respond to a query regarding a legal topic "even if the answer contains errors, hallucinations, falsehoods, or biases." *Id.* (In 2023 and 2024, various companies introduced GAI tools trained using legal authorities. Those legal GAI tools are not implicated in this appeal, and we offer no opinion on their ability to provide accurate responses to queries concerning legal issues.)

 [14]  ¶ 33 For these reasons, individuals using the current generation of general-purpose GAI tools to assist with legal research and drafting must be aware of the tools' propensity to generate outputs containing fictitious legal authorities and must ensure that such fictitious citations do not appear in any court filing.

*7  [15]  ¶ 34 Even if Al-Hamim lacked actual knowledge that GAI tools can produce fake citations, "[a] *pro se* litigant who chooses to rely upon his own understanding of legal principles and procedures is required to follow the same procedural rules as those who are qualified to practice law and must be prepared to accept the consequences of his mistakes and errors." *Rosenberg v. Grady*, 843 P.2d 25, 26 (Colo. App. 1992). (We note that Al-Hamim filed his opening brief on June 24, 2024 — more than one year after media outlets throughout the country reported on the attorneys' submission of a brief filled with ChatGPT-generated hallucinations in *Mata*. *See, e.g.*, Benjamin Weiser, *Here's What Happens When Your Lawyer Uses ChatGPT*, N.Y. Times (May 27, 2023), https://perma.cc/H4DC-JWH2; Larry Neumeister, *Lawyers Submitted Bogus Case Law Created by ChatGPT. A Judge Fined Them $5,000*, Associated Press (June 22, 2023), https://perma.cc/2B27-PHJN. By mid-2024, GAI tools' propensity to produce hallucinations in response to queries regarding legal issues was not arcana known only to members of the bar and judges.)

 [16]  ¶ 35 C.A.R. 28(a)(7)(B) requires that an appellant's opening brief provide "a clear and concise discussion of the grounds upon which the party relies in seeking a reversal ... of the judgment ... of the lower court or tribunal, with citations to the authorities ... on which the appellant relies." The submission of a brief containing GAI-produced hallucinations runs afoul of this rule.

C. Appropriate Sanctions When a Self-Represented Litigant Submits a Court Filing Containing Hallucinations

 [17]  ¶ 36 This court has the authority to "dismiss an appeal" or "impose other sanctions it deems appropriate, including attorney fees," if a party fails to comply with the Colorado Appellate Rules. C.A.R. 38(a), 39.1. Until today, no Colorado appellate court has considered the consequences for a self-represented litigant who submits a brief containing hallucinations.

¶ 37 Other courts, however, have considered an appropriate sanction under these circumstances. In *Anonymous v. New York City Department of Education*, the self-represented plaintiff submitted a filing containing hallucinations. No. 24-cv-04232, 2024 WL 3460049, at *7 (S.D.N.Y. July 18, 2024) (unpublished opinion). The court noted that "[s]anctions may be imposed for submitting false and nonexistent legal authority to the [c]ourt." *Id.* However, the court declined to impose sanctions due to the plaintiff's status as a self-represented litigant and, instead, warned the plaintiff and other self-represented litigants that future submissions of false citations would likely result in sanctions. *Id.* Other courts have taken a similar approach. *See, e.g.*, *Transamerica Life Ins. Co. v. Williams*, No. CV-24-00379, 2024 WL 4108005, at *2 n.3 (D. Ariz. Sept. 6, 2024) (unpublished order) (warning a self-represented litigant whose filings were "replete with citations to nonexistent caselaw and legal authorities that do not correspond to her claims, suggesting that [she] may be using AI, such as ChatGPT, to draft her briefs," and that "[a]ny future filings with citations to nonexistent cases may result in sanctions"); *Dukuray v. Experian Info. Sols.*, No. 23-cv-9043, 2024 WL 3812259, at *11 (S.D.N.Y. July 26, 2024) (unpublished report and recommendation) (advising the self-represented plaintiff that future filings containing false citations may result in sanctions), *adopted*, 2024 WL 3936347 (S.D.N.Y. Aug. 26,

2024) (unpublished order); *Morgan v. Cmty. Against Violence*, No. 23-cv-353-WPJ/JMR, 2023 WL 6976510, at *8 (D.N.M. Oct. 23, 2023) (unpublished opinion) (asserting that the self-represented status of a plaintiff who "cited to several fake or nonexistent opinions" will "*not* be tolerated by the [c]ourt as an excuse for failing to adhere to this [c]ourt's rules" and warning that "*[a]ny future filings with citations to nonexistent cases may result in sanctions*"); *N.E.W. Credit Union v. Mehlhorn*, No. 2023AP2187, 2024 WL 3770741, at *2 (Wis. Ct. App. Aug. 13, 2024) (unpublished opinion) (admonishing the appellant for submitting false citations but declining to dismiss the appeal as a sanction).

**\*8** ¶ 38 The Missouri Court of Appeals dismissed an appeal where the self-represented appellant submitted a filing containing false citations, among other violations of the court's rules. *Kruse v. Karlen*, 692 S.W.3d 43, 53 (Mo. Ct. App. 2024). The appellant's violations included his failure "to file an Appendix," to provide "an [ ]adequate Statement of Facts," and to include a "Points Relied On" section in her brief. *Id.* at 47-48. The court concluded that dismissal was an appropriate remedy because the "[a]ppellant ha[d] *substantially* failed to comply with [the] court rules." *Id.* at 53 (emphasis added).

 **[18]**  ¶ 39 While we conclude that Al-Hamim's submission of a brief containing hallucinations violated C.A.R. 28(a)(7)(B), this deviation from the Appellate Rules was not as serious as the self-represented appellant's misconduct in *Kruse*. Further, in his response to our show cause order, Al-Hamim acknowledged his use of AI, apologized for his mistake, and accepted responsibility for including hallucinations in his opening brief. (We rejected his request to submit an amended opening brief that only cited real cases, however. While we do not impose sanctions against Al-Hamim, his inclusion of hallucinations in his original brief does not entitle him to a second opportunity to file an opening brief.)

¶ 40 Because until now, no Colorado appellate court has considered appropriate sanctions for a self-represented litigant's submission of a brief containing GAI-derived hallucinations, and because the record does not show that Al-Hamim previously filed court documents containing fake citations, we conclude that imposing monetary sanctions or dismissing this appeal would be disproportionate to Al-Hamim's violation of the Appellate Rules. Further, in their answer brief, the landlords failed to alert this court to the hallucinations in Al-Hamim's opening brief and did not request an award of attorney fees against Al-Hamim. Under the circumstances, we exercise our discretion not to order Al-Hamim to pay the landlords' attorney fees or to impose another form of sanction against him. *See Auxier v. McDonald*, 2015 COA 50, ¶ 29, 363 P.3d 747, 754.

 **[19]**  ¶ 41 However, we warn Al-Hamim, as well as lawyers and self-represented parties who appear in this court, that we will not "look kindly on similar infractions in the future." *Anonymous*, 2024 WL 3460049, at *7. A lawyer's or a self-represented party's future filing in this court containing GAI-generated hallucinations may result in sanctions.

IV. Disposition

¶ 42 The judgment is affirmed.

JUDGE J. JONES and JUDGE SULLIVAN concur.

**All Citations**

--- P.3d ----, 2024 WL 5230126, 2024 COA 128

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.